**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE (O.B.J.), an individual, | Case No. 1:25-cv-10815 |
| Plaintiff, | **COMPLAINT** |
| v. | **WITH JURY DEMAND** |
| INTER-CONTINENTAL HOTELS GROUP, INC.; INTERCONTINENTAL HOTELS GROUP (U.S.A.) FRANCHISING, INC.; SIX CONTINENTS HOTELS, INC.; HOLIDAY HOSPITALITY FRANCHISING, LLC; CWI CHELSEA HOTEL, LLC and BRISAM MANAGEMENT (DE) LLC d/b/a HOLIDAY INN EXPRESS | |
| Defendants. | |

Jane Doe (O.B.J.), Plaintiff in the above-styled and numbered cause, files this Original Petition against INTER-CONTINENTAL HOTELS GROUP, INC.; INTERCONTINENTAL HOTELS GROUP (U.S.A.) FRANCHISING, INC.; SIX CONTINENTS HOTELS, INC.; HOLIDAY HOSPITALITY FRANCHISING, LLC; CWI CHELSEA HOTEL, LLC and BRISAM MANAGEMENT (DE) LLC, as Defendants, and would respectfully show the Court and jury as follows:

## SUMMARY

1. Jane Doe (O.B.J.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a

1

commercial sex act through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

3.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.      Jane Doe (O.B.J.) alleges that Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (O.B.J.), with minimal risk of detection or interruption. Jane Doe (O.B.J.) further alleges that Defendants continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

7.      Defendants had the knowledge and opportunity to prevent the severe and permanent harm that Jane Doe (O.B.J.) experienced as the result of continuous sexual exploitation.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102

Defendants failed to do so. Instead, Defendants chose to benefit from facilitating sex trafficking. Accordingly, Jane Doe (O.B.J.) files this lawsuit.

## **PARTIES**

8.    Plaintiff, Jane Doe (O.B.J.) is a resident of Arizona. She may be contacted through her lead counsel, whose information is contained below.

9.    Jane Doe (O.B.J.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

10.    The trafficking of Jane Doe (O.B.J.) occurred in or affected interstate commerce.

11.    Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (O.B.J.)

12.    Inter-Continental Hotels Group, Inc. is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

13.    Intercontinental Hotels Group (U.S.A.) Franchising, Inc. is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

14.    Defendant Six Continents Hotels, Inc., is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

15.    Defendant Holiday Hospitality Franchising, LLC is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

16.    Defendants Inter-Continental Hotels Group, Inc.; Intercontinental Hotels Group (U.S.A.) Franchising, Inc.; Six Continents Hotels, Inc., and Holiday Hospitality Franchising, LLC will collectively be referred to as "IHG," "IHG Defendants," or "Franchisor Defendants." The IHG Defendants were at all relevant times corporate affiliates under the IHG umbrella who were subject to common ownership, had highly integrated operations, shared employees, used common tools and resources, and shared information.  All of the IHG Defendants participated in and benefited from the operation of IHG branded hotels, including the Subject Holiday Inn locations below. Upon information and belief, IHG owned, operated, controlled, and/or managed the following Franchisee locations:

a.    CWI CHELSEA HOTEL, LLC d/b/a Holiday Inn Manhattan 6th Ave-Chelsea located at 125 W 26th Street, New York, NY 10001.

b.    BRISAM MANAGEMENT (DE) LLC d/b/a Holiday Inn Express NYC Chelsea - Nomad Area by IHG located at 232 W. 29th Street, New York, NY 10001.

17.    All references to Holiday Inn include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Holiday Inn now or at any time relevant to the claims herein

18.    Defendant CWI Chelsea Hotel, LLC is a for-profit Delaware limited liability company with its principal place of business in New York City, New York. It may be served through its registered agent Corporation Service Company, 80 State Street, Albany, NY 12207. At all relevant times, Defendant CWI Chelsea Hotel, LLC owned, operated, controlled, and/or managed the franchised Holiday Inn located at 125 W 26th Street, New York, NY 10001. CWI Chelsea Hotel, LLC will be referred to as "Holiday Inn", "Chelsea", "Franchisee Defendant" or

4

"Franchisee."

19.    Defendant Brisam Management (DE) LLC is a for-profit Delaware limited liability company with its principal place of business in Albany, New York. It may be served through its registered agent Corporation Service Company, 80 State Street, Albany, NY 12207. At all relevant times, Defendant Brisam Management (DE) LLC owned, operated, controlled, and/or managed the franchised Holiday Inn Express located at 232 W 29th Street, New York, NY 10001. Brisam Management (DE) LLC will be referred to as "Holiday Inn Express", "Brisam", "Franchisee Defendant" or "Franchisee."

20.    In the event any parties are misnamed or not included herein, such event was a misnomer, or such parties are or were alter egos of parties named herein. Thus, Plaintiff Jane Doe (O.B.J.) brings suit against all partnerships, unincorporated associations, individuals, entities, and private corporations doing business under the assumed name of or including the words: Holiday Inn, Holiday Franchising, Holiday Management, Intercontinental Holiday Group, and Holiday.

21.    IHG Defendants and Franchisee Defendants will collectively be referred to as "Defendants."

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

23.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

24.    Under 28 U.S.C. § 1391(c)(2), Franchisor Defendants and Franchisees are residents of New York for the purpose of § 1391(b)(2) because the Court has personal jurisdiction over each Franchisee.

5

25.    Under § 1391(d), Franchisor Defendants and Franchisees are residents of New York for the purpose of § 1391(b)(2) because, if the Southern District of New York was a separate state, the Franchisees' contacts with the district would be sufficient to subject it to personal jurisdiction.

26.    Plaintiff's claims against Franchisors arise out of Franchisors' contacts with New York through Franchisors' relationships with the Franchisees, which operated the subject hotel properties in the Southern District of New York and have their principal place of business in the Southern District of New York. Franchisors' participation in a venture with the Franchisee Defendant operating the subject motels occurred, in substantial part, in New York. The benefit received by the Franchisors originated and was sought for collection in New York.

<b><u>STATEMENT OF FACTS</u></b>

**I.    Jane Doe (O.B.J.) was a Victim of Unlawful Sex Trafficking at Hotels Owned, Operated, Managed and Controlled by Defendants.**

27.    Jane Doe (O.B.J.) is a survivor of sex trafficking. Her trafficking began around July 2015 and continued through January 2016.

28.    Jane Doe (O.B.J.) met her trafficker in 2015. Jane Doe (O.B.J.) went with a friend to New York under the pretense of meeting the friend's boyfriend, having no reason or knowledge to suspect that she would be accused of stealing and forced into sex trafficking. However, her trafficker held her responsible for theft perpetrated by her friend and from July of 2015 and continuously through January 2016, Jane Doe (O.B.J.) was forced to engage in commercial sex acts numerous times a day by her trafficker who would physically and mentally abuse her. Jane Doe (O.B.J.) was in constant fear for her life.

29.    She did not want to engage in commercial sex acts but when she tried to leave, her trafficker would threaten her life and the life of her family members. Her trafficker engaged in a pattern of control and intimidating and threatening behavior that caused Jane Doe (O.B.J.) to

believe she would face serious harm or physical restraint if she did not comply with their ongoing demand that she engage in commercial sex for his financial benefit.

30.     Jane Doe (O.B.J.) was not allowed to keep any of the money she made.

31.     At numerous times between July 2015 and January 2016, Jane Doe (O.B.J.) was trafficked at the Holiday Inn located at 125 W. 26th St., New York, New York 10001.

32.     At numerous times between July 2015 and January 2016, Jane Doe (O.B.J.) was trafficked at the Holiday Inn Express located at 232 W. 29th St., New York, New York 10001.

33.     Jane Doe (O.B.J.)'s sexual exploitation repeatedly occurred in rooms of the Subject Holiday Inn and Holiday Inn Express and was facilitated by the IHG Defendants and Franchisee Defendants.

34.     Between July 2015 and January 2016, Jane Doe (O.B.J.) was trafficked numerous times at both the Subject Holiday Inn and Holiday Inn Express.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

35.     While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Franchisor Defendants and Franchisee Defendants knew or should have known regarding the trafficking at their hotel properties, trafficking activity, including that of Jane Doe (O.B.J.) was pervasive and apparent at the locations at issue.

36.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/, citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

37.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[6]

38.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[7]

39.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

> a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

---

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf.

[7] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*,_https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting- Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

8

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control over or possession of money or ID;

h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items—such as no luggage or other bags;

j. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k. A group of girls appears to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or use of large amounts of cash or pre-paid cards.[8]

40. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[9] From check-in to check-out, there are indicators that traffickers and their victims

---

[8] *Id.*

[9] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

routinely exhibit during their stay at a hotel.

41.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[10] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

42.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

43.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

44.     The most effective weapon against sexual exploitation and human trafficking is education and training.[12] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[13]

---

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[11] *Id.*

[12] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[13] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

10

45.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[14] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

46.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

47.     Each of the Franchisor Defendants and Franchisee Defendant had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

48.     Unfortunately for Jane Doe (O.B.J.), the promises made by the Franchisor Defendants and Franchisee Defendant have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (O.B.J.).

### III.     Sex Trafficking Has Long Been Prevalent at Holiday Inn Branded Properties, and Defendants Have Known About It.

49.     Defendants' actual knowledge is *not* limited to a general awareness of the problem

---

[14] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (O.B.J.)'s trafficking, that sex trafficking was ongoing and widespread at Hyatt and Holiday Inn Express branded properties including the subject properties named herein.

### a. Sex Trafficking at Holiday Inn and Holiday Inn Express Branded Hotels was well Known by Defendants.

50.     Upon information and belief, each of the Defendants monitored criminal activity occurring at Holiday Inn and Holiday Inn Express branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe (O.B.J.) was trafficked.

51.     Scores of news stories from across the United States highlight IHG's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of both Holiday Inn and Holiday Inn Express hotels for sex trafficking.

52.     Information that has become public through news stories establishes the entrenched and pervasive nature of IHG's role in providing a venue where sex trafficking has continued unabated for years.

53.     Among notable press involving the frequent use of Holiday Inn and Holiday Inn Express hotels for illegal activity, the following was noted:

- In April 2017, a 16 year old trafficking victim was rescued by police at a Holiday Inn hotel in Elk Grove, California after her Uber driver noticed signs of trafficking as he dropped her off at the hotel and called the police.

- In September 2018, a man was criminally charged after a three month investigation for sex trafficking and was arrested at a Holiday Inn Express in Plainview, New York.

- In 2014, police arrested several individuals for running a sex trafficking ring out of a Holiday Inn Express in Allentown, Pennsylvania.

- A 2017 analysis by the Houston Chronicle showed that Holiday Inn branded hotels were one of the most common locations for prostitution and sex trafficking arrests made by the Houston Police Department.[15]

---

[15] Police: Gang Member Forced Women Into Prostitution, News12 New York, https://bronx.news12.com/police- gang-member-

54. Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Holiday Inn and Holiday Inn Express branded properties.

55. Based on information and belief, the IHG Defendants and Franchisee Defendants managed and monitored on-line reviews of Holiday Inn and Holiday Inn Express hotel locations nationwide, and would have had knowledge of the following:

    a. There was widespread and ongoing sex trafficking occurring at Holiday Inn and Holiday Inn Express branded properties;

    b. Sex trafficking was a brand-wide problem for Holiday Inn and Holiday Inn Express properties, originating from management level decisions at IHG's corporate offices;

    c. Holiday Inn and Holiday Inn Express franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

    d. IHG's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

    e. IHG and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

56. Despite the mounting evidence that sex trafficking at Holiday Inn and Holiday Inn Express properties was ongoing and growing, Franchisor Defendants and the Franchisees chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

    **b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Holiday Inn Express.**

57. Franchisor Defendants and Franchisee Defendant were specifically aware that sex

---

forced-women-into-prostitution-39006797; Prostitutes From Maryland Worked Out Of Downtown Allentown Hotel, Police Say, Lehigh Valley Live, https://www.lehighvalleylive.com/allentown/2014/04/trio_ran_prostitution_business.html; Houston's Most Popular Hotels For Prostitution Busts, Houston Chronicle, https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php; Review of Holiday Inn Express – Asheville,North Carolina (Sep. 28,2017), available at https://www.tripadvisor.com/ShowUserReviews-g60742-d93926-r528092206- Holiday_Inn_Asheville_Biltmore_West-Asheville_North_Carolina.html.

trafficking was widespread and ongoing at the Subject Holiday Inn and Subject Holiday Inn Express.

58.    Online reviews of the Subject Holiday Inn and Subject Holiday Inn Express hotel, which upon information and belief were monitored by Franchisor Defendants and each Franchisee Defendant, respectively, established the nature of the role the subject hotels served as a venue for sex trafficking.

59.    Traffickers, including Jane Doe (O.B.J.)'s trafficker, repeatedly chose to use the Subject Holiday Inn and Subject Holiday Inn Express for their sex trafficking activity. As such, Franchisor Defendants and Franchisee Defendants (respectively) also knew or should have known about the pervasive sex trafficking at the Holiday Inn and Holiday Inn Express locations based on obvious indicators of this activity.

60.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at both the Subject Holiday Inn and Subject Holiday Inn Express named herein prior to Jane Doe (O.B.J.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

61.    All knowledge from the staff at both the Subject Holiday Inn and the Subject Holiday Inn Express is imputed to the respective Franchisee Defendant operator of the hotel.

14

62. Both Franchisee Defendants (Chelsea and Brisam) knew about this widespread and ongoing trafficking at their respective hotel, including the trafficking of Jane Doe (O.B.J.), through the direct observations of hotel staff, including management-level staff.

63. Upon information and belief, the Franchisor Defendants also knew or should have known about the widespread trafficking at the Subject Holiday Inn and Subject Holiday Inn Express hotels referenced herein, based on:

a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Franchisor Defendants;

b. The Defendants' regular monitoring of online reviews;

c. The Defendants' collection and monitoring of customer surveys and complaints;

d. The Defendants' regular inspections of the hotel property;

e. Information provided to Defendants by law enforcement; and

f. Other sources of information available to Defendants.

64. Upon information and belief, under the Franchisor Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the Franchisor Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the Franchisor Defendants prior to Jane Doe (O.B.J.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Subject Holiday Inn Express.

**a. Defendants knew Jane Doe (O.B.J.) was being trafficked at these hotels because of the apparent and obvious "red flags" of sex trafficking.**

65. During the period that Jane Doe (O.B.J.) was trafficked at the both the Subject Holiday Inn and Holiday Express named herein, there were obvious signs that her trafficker was engaged in sex trafficking at both, including:

a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

15

b. Often, neither Jane Doe (O.B.J.) nor her trafficker were required to provide ID at check in;

c. Jane Doe (O.B.J.) would be dressed in provocative clothing and accompanied by her trafficker upon check in, but would not make eye contact with hotel staff nor speak to them;

d. Other women were trafficked at the same hotel at the same time as Jane Doe (O.B.J.);

e. Even though Jane Doe (O.B.J.) and her trafficker would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

f. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services, but Plaintiff or her trafficker would often ask for a remarkable number of towels from housekeeping or the front desk;

g. The trafficker would linger near the room or in the hotel lobby in full view of staff members and managers while she was with a john;

h. Management and/or staff at both locations would solicit services from Jane Doe (O.B.J.) and other girls being trafficked;

i. There was heavy foot traffic (5-10 men per day) in and out of Jane Doe (O.B.J.)'s room involving men who were not hotel guests, who would enter the hotel through the lobby at unusual times and stay for only a short amount of time; and

j. Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

66. Jane Doe (O.B.J.) was trafficked at each location listed in this lawsuit for several days at a time, at least 2-3 times per month, leading the staff at each hotel to recognize her and her trafficker upon check-in.

67. Based upon information and belief, multiple employees at both Franchisee hotels, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

68. As such, Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (O.B.J.) was being trafficked at each respective hotel.

69. Given these obvious signs, IHG knew or should have known about the trafficking

16

of Jane Doe (O.B.J.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

**IV.    Defendants actively facilitated sex trafficking at the Subject Holiday Inn and Subject Holiday Inn Express, including the trafficking of Jane Doe (O.B.J.).**

70.    Franchisor Defendants and Franchisee Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (O.B.J.) at the Franchisee hotels because the trafficking was the direct result of Franchisor Defendants and Franchisees facilitating her trafficking at these hotels:

**a.    CWI CHELSEA HOTEL, LLC d/b/a Holiday Inn Manhattan 6th Ave-Chelsea located at 125 W 26th Street, New York, NY 10001.**

71.    Chelsea is responsible for the acts, omissions, and knowledge of all employees of the Subject Holiday Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, both because they ratified these acts and omissions, and also because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Chelsea, of sex trafficking occurring at Holiday Inn branded locations including their Subject Holiday Inn.

72.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Holiday Inn, Chelsea continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

73.    Chelsea knew or was willfully blind to the fact that Jane Doe (O.B.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (O.B.J.)'s sexual exploitation.

74.    Chelsea also facilitated widespread trafficking at their Subject Holiday Inn, including the trafficking of Jane Doe (O.B.J.), in ways including:

17

a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

### b. Brisam Management (DE) LLC d/b/a Holiday Inn Express NYC Chelsea - Nomad Area by IHG facilitated the trafficking of Jane Doe (O.B.J.).

75. Brisam is responsible for the acts, omissions, and knowledge of all employees of the Subject Holiday Inn Express when operating the hotel because these acts and omissions were committed in the course and scope of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Brisam, of sex trafficking occurring at Holiday Inn Express branded locations including their Subject Holiday Inn Express.

76. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Holiday Inn Express, Brisam continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

77. Brisam knew or was willfully blind to the fact that Jane Doe (O.B.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (O.B.J.)'s sexual exploitation.

78. Brisam also facilitated widespread trafficking at their Subject Holiday Inn Express, including the trafficking of Jane Doe (O.B.J.), in ways including:

18

a.   allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b.   inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.   choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d.   implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**c.   The Franchisor Defendants facilitated the trafficking of Jane Doe (O.B.J.).**

79.    Upon information and belief, the IHG Defendants participated directly in aspects of the operation of both the Subject Holiday Inn and Subject Holiday Inn Express that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (O.B.J.), as follows:

a.   The Franchisor Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

b.   The Franchisor Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

c.   The Franchisor Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Franchisor Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

d.   Although they delayed making any reasonable effort to do so, the Franchisor Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

e.   The Franchisor Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Holiday Inn Express;

19

f.  The Franchisor Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject Holiday Inn Express, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

g.  The Franchisor Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Holiday Inn Express, including trends that would reveal patterns consistent with human trafficking.

80.  Franchisor IHG Defendants directly participated in and retained day-to-day control over renting rooms at both the Subject Holiday Inn and Subject Holiday Inn Express by, among other things:

a.  The Franchisor Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.  The Franchisor Defendants directly made reservations for rooms at the Subject Holiday Inn and Subject Holiday Inn Express and accepted payment for those rooms through a central reservation system that they controlled and operated. The Franchisor Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c.  The Franchisor Defendants established and maintained control over a brand-wide "do not rent" system. The Franchisor Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at both Franchisee hotels through detailed policies that it established regarding use of this "do not rent" system;

d.  The Franchisor Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e.  The Franchisor Defendants controlled and restricted the ability of both franchisees and their respective staff to refuse or cancel a reservation;

f.  The Franchisor Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g.  The Franchisor Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Franchisee hotels;

h.  The Franchisor Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Franchisee hotels until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of

20

guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. The Franchisor Defendants required their franchisees to use Holiday Inn's property management system, which was owned, maintained, controlled, and operated by the Franchisor Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

81. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Franchisee hotels named herein, Franchisor Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (O.B.J.).

82. Franchisor Defendants knew or should have known that Jane Doe (O.B.J.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them hotel rooms and related services to facilitate Jane Doe (O.B.J.)'s sexual exploitation.

83. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking of Jane Doe (O.B.J.) and others at the Franchisee hotels, the Franchisor Defendants continued participating in a venture at these hotels, with its Franchisees and their respective hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a. The Franchisor Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b. The Franchisor Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c. The Franchisor Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Holiday Inn and Holiday Inn Express properties;

d. The Franchisor Defendants implicitly approved decisions by Franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e. The Franchisor Defendants continued to use policies, protocols, and practices at the

21

Franchisee hotels that had been shown to lead to widespread trafficking;

f. The Franchisor Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the Franchisee Hotels, the Franchisor Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h. The Franchisor Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i. The Franchisor Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j. The Franchisor Defendants provided traffickers with access to internet services in a manner that the they knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

84. If Franchisor Defendants had exercised reasonable diligence when operating their branded properties and in the areas where it retained control, Franchisor Defendants would have prevented these Franchisee hotels from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (O.B.J.). Instead, Franchisor Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (O.B.J.).

## V.    Defendants' ventures at the Subject Holiday Inn.

85. Through the conduct described above, Franchisor Defendants and Franchisee Defendant Chelsea knowingly benefited from engaging in a venture with sex traffickers at the Subject Holiday Inn named herein, including Jane Doe (O.B.J.)'s traffickers, as follows:

a. Franchisor Defendants and Franchisee Defendant both received benefits, including increased revenue, every time a room was rented at any Holiday Inn location;

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Subject Holiday Inn, which Franchisor Defendants and Franchisee Defendant knew or should have known about;

22

c. Franchisor Defendants and Franchisee Defendant associated with traffickers, including Jane Doe (O.B.J.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d. Franchisor Defendants and Franchisee Defendant had a mutually beneficial relationship with the traffickers at the Subject Holiday Inn, fueled by sexual exploitation of victims, including Jane Doe (O.B.J.);

e. Sex traffickers, including Jane Doe (O.B.J.)'s traffickers, frequently used the Subject Holiday Inn for their trafficking because of an implicit understanding that the Subject Holiday Inn was an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Franchisor Defendants and Franchisee Defendant facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Defendants;

f. Both Franchisor Defendants and Franchisee Defendant participated in this venture through the conduct described throughout Plaintiff's Original Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g. Jane Doe (O.B.J.)'s trafficking at the Subject Holiday Inn was a result of Franchisor Defendants and Franchisee Defendant's participation in a venture with criminal traffickers. If Franchisor Defendants and Franchisee had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (O.B.J.)'s trafficking at the Subject Holiday Inn.

86.    Through the conduct described above, Franchisor Defendants also knowingly benefited from engaging in a commercial venture with Franchisee Defendant operating the Subject Holiday Inn as follows:

a. Franchisor Defendants associated with Franchisee Defendant to operate the Subject Holiday Inn;

b. Pursuant to the terms of the franchising agreement, both Franchisor Defendants and Franchisee Defendant received financial benefits from operating the Subject Holiday Inn, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue;

c. By participating in a venture that facilitated sex trafficking, Franchisor Defendants and Franchisee Defendant also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and Subject Holiday Inn specifically;

23

d. This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendant and the widespread sex trafficking at the Subject Holiday Inn named herein;

e. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Holiday Inn participated in the venture by continuing to associate with Franchisee Defendant to operate the Subject Holiday Inn named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (O.B.J.); and

f. Jane Doe (O.B.J.)'s trafficking at Subject Holiday Inn named herein was a result of Franchisor Defendants and Franchisee Defendant's facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Subject Holiday Inn Express. Had Holiday Inn not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), it would not have received a benefit from Jane Doe (O.B.J.)'s trafficking at the Subject Holiday Inn Express named herein.

## VI.    Franchisee Defendant Chelsea and the Staff at the Subject Holiday Inn Named Herein Acted as Actual Agents of Holiday Inn.

87. Holiday Inn is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant Chelsea and staff at the Subject Holiday Inn named herein, which are Holiday Inn's actual agents or subagents.

88. The Franchisor Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Holiday Inn named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Franchisor Defendants.

89. The Franchisor Defendants obscure the full extent of control they exercise over the Franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Franchisee Defendant imposed on the franchisees:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Holiday Inn;

24

b. covered virtually all aspects of hotel operations, including internal operating functions;

c. dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Holiday Inn; and

d. significantly exceeded what was necessary for Holiday Inn to protect its registered trademarks.

90. In addition to the ways described above, upon information and belief, Holiday Inn exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Holiday Inn named herein, including the following ways:

a. The Franchisor Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Franchisor Defendants to protect their registered trademarks;

b. The Franchisor Defendants provided training for hotel management and select hotel staff on-site at the Subject Holiday Inn and at locations selected by the Franchisor Defendants;

c. The Franchisor Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. The Franchisor Defendants controlled training provided by franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Franchisor Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisees were required to purchase to operate the Subject Holiday Inn named herein, the Franchisor Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g. The Franchisor Defendants required franchisee to sign a technology agreement governing the terms under which franchisee must procure and use technical services and software while operating the Subject Holiday Inn named herein. Franchisee was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. The Franchisor Defendants set required staffing levels for the Subject Holiday Inn

25

named herein;

i.  The Franchisor Defendants established detailed job descriptions for all positions in its Holiday Inn properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  The Franchisor Defendants set requirements for the hiring process used by franchisee and oversaw employee discipline processes and termination decisions;

k.  The Franchisor Defendants provided benefits for employees of franchised hotels;

l.  The Franchisor Defendants required Defendant Franchisee to use a customer resource management program maintained and operated by the Franchisor Defendants;

m.  The Franchisor Defendants controlled channels for guests to report complaints or provide feedback regarding the Subject Holiday Inn and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Franchisor Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs;

n.  The Franchisor Defendants generated reports and analysis of guest complaints and online reviews for the Subject Holiday Inn;

o.  The Franchisor Defendants required Franchisee to use a Guest Relations Application owned, operated, and maintained by the Franchisor Defendants to manage all guest data and information. The Franchisor Defendants could use the backend of this system to analyze data and generate reports;

p.  The Franchisor Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisee and to bill franchisee directly for that insurance if the Franchisor Defendants determined that the franchisees have not purchased adequate insurance;

q.  The Franchisor Defendants regularly audited the books and records of Franchisee;

r.  The Franchisor Defendants conducted frequent and unscheduled inspections of Holiday Inn properties, including the Subject Holiday Inn named herein;

s.  The Franchisor Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisee violated any of the Franchisor Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Holiday Inn named herein;

t.  The Franchisor Defendants controlled all marketing for the Subject Holiday Inn and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the Franchisor Defendants;

26

u. The Franchisor Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations;

v. The Franchisor Defendants supervised and controlled day-to-day operations of the Subject Holiday Inn named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use; and

w. The Franchisor Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## VII. Defendants' ventures at the Subject Holiday Inn Express.

91. Through the conduct described above, Franchisor Defendants and Franchisee Defendant Brisam knowingly benefited from engaging in a venture with sex traffickers at the Subject Holiday Inn Express named herein, including Jane Doe (O.B.J.)'s traffickers, as follows:

a. Franchisor Defendants and Franchisee Defendant both received benefits, including increased revenue, every time a room was rented at any Holiday Inn Express location;

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Subject Holiday Inn Express, which Franchisor Defendants and Franchisee Defendant knew or should have known about;

c. Franchisor Defendants and Franchisee Defendant associated with traffickers, including Jane Doe (O.B.J.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d. Franchisor Defendants and Franchisee Defendant had a mutually beneficial relationship with the traffickers at the Subject Holiday Inn Express, fueled by sexual exploitation of victims, including Jane Doe (O.B.J.);

e. Sex traffickers, including Jane Doe (O.B.J.)'s traffickers, frequently used the Subject Holiday Inn Express for their trafficking because of an implicit understanding that the Subject Holiday Inn Express was an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Franchisor Defendants and Franchisee Defendant facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Defendants;

f. Both Franchisor Defendants and Franchisee Defendant participated in this venture through the conduct described throughout Plaintiff's Original Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

27

g. Jane Doe (O.B.J.)'s trafficking at the Subject Holiday Inn Express was a result of Franchisor Defendants and Franchisee Defendant's participation in a venture with criminal traffickers. If Franchisor Defendants and Franchisee had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (O.B.J.)'s trafficking at the Subject Holiday Inn Express.

92.    Through the conduct described above, Franchisor Defendants also knowingly benefited from engaging in a commercial venture with Franchisee Defendant operating the Subject Holiday Inn Express as follows:

a. Franchisor Defendants associated with Franchisee Defendant to operate the Subject Holiday Inn Express;

b. Pursuant to the terms of the franchising agreement, both Franchisor Defendants and Franchisee Defendant received financial benefits from operating the Subject Holiday Inn Express, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue;

c. By participating in a venture that facilitated sex trafficking, Franchisor Defendants and Franchisee also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and Subject Holiday Inn Express specifically;

d. This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendant and the widespread sex trafficking at the Subject Holiday Inn Express named herein;

e. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Holiday Inn participated in the venture by continuing to associate with Franchisee Defendant to operate the Subject Holiday Inn Express named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (O.B.J.); and

f. Jane Doe (O.B.J.)'s trafficking at Subject Holiday Inn Express named herein was a result of Franchisor Defendants and Franchisee Defendant's facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Subject Holiday Inn Express. Had Holiday Inn not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), it would not have received a benefit from Jane Doe (O.B.J.)'s trafficking at the Subject Holiday Inn Express named herein.

VIII.    **Franchisee Defendant Brisam and the Staff at the Subject Holiday Inn Express Named Herein Acted as Actual Agents of Holiday Inn.**

28

93.    Holiday Inn is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant Brisam and staff at the Subject Holiday Inn Express named herein, which are Holiday Inn's actual agents or subagents.

94.    The Franchisor Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Holiday Inn Express named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Franchisor Defendants.

95.    The Franchisor Defendants obscure the full extent of control they exercise over the Franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Franchisee Defendant imposed on the franchisees:

   a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Holiday Inn Express;

   b. covered virtually all aspects of hotel operations, including internal operating functions;

   c. dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Holiday Inn Express; and

   d. significantly exceeded what was necessary for Holiday Inn to protect its registered trademarks.

96.    In addition to the ways described above, upon information and belief, Holiday Inn exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Holiday Inn Express named herein, including the following ways:

   a. The Franchisor Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary

29

for the Franchisor Defendants to protect their registered trademarks;

b.  The Franchisor Defendants provided training for hotel management and select hotel staff on-site at the Subject Holiday Inn Express and at locations selected by the Franchisor Defendants;

c.  The Franchisor Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d.  The Franchisor Defendants controlled training provided by franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  The Franchisor Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  For certain products and services that franchisees were required to purchase to operate the Subject Holiday Inn Express named herein, the Franchisor Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g.  The Franchisor Defendants required franchisee to sign a technology agreement governing the terms under which franchisee must procure and use technical services and software while operating the Subject Holiday Inn Express named herein. Franchisee was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h.  The Franchisor Defendants set required staffing levels for the Subject Holiday Inn Express named herein;

i.  The Franchisor Defendants established detailed job descriptions for all positions in its Holiday Inn Express properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  The Franchisor Defendants set requirements for the hiring process used by franchisee and oversaw employee discipline processes and termination decisions;

k.  The Franchisor Defendants provided benefits for employees of franchised hotels;

l.  The Franchisor Defendants required Defendant Franchisee to use a customer resource management program maintained and operated by the Franchisor Defendants;

m.  The Franchisor Defendants controlled channels for guests to report complaints or provide feedback regarding the Subject Holiday Inn Express and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Franchisor Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs;

30

n. The Franchisor Defendants generated reports and analysis of guest complaints and online reviews for the Subject Holiday Inn Express;

o. The Franchisor Defendants required Franchisee to use a Guest Relations Application owned, operated, and maintained by the Franchisor Defendants to manage all guest data and information. The Franchisor Defendants could use the backend of this system to analyze data and generate reports;

p. The Franchisor Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisee and to bill franchisee directly for that insurance if the Franchisor Defendants determined that the franchisees have not purchased adequate insurance;

q. The Franchisor Defendants regularly audited the books and records of Franchisee;

r. The Franchisor Defendants conducted frequent and unscheduled inspections of Holiday Inn Express properties, including the Subject Holiday Inn Express named herein;

s. The Franchisor Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisee violated any of the Franchisor Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Holiday Inn Express named herein;

t. The Franchisor Defendants controlled all marketing for the Subject Holiday Inn Express and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the Franchisor Defendants;

u. The Franchisor Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations;

v. The Franchisor Defendants supervised and controlled day-to-day operations of the Subject Holiday Inn Express named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use; and

w. The Franchisor Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## IX.    Defendants are Jointly and Severally Liable for Jane Doe (O.B.J.)'s Damages.

97.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (O.B.J.).

98.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (O.B.J.) for past and future losses she suffered as a proximate result of

31

her sexual exploitation and trafficking.

**CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**

99.     Jane Doe (O.B.J.)  incorporates all previous allegations.

**I.     Count I: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

100.     Jane Doe (O.B.J.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

101.     Through acts and omissions described throughout this Petition, Franchisor Defendants and Franchisee Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe (O.B.J.)'s trafficker, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (O.B.J.)'s trafficker, was engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendants are liable as a beneficiaries under 18 U.S.C §1595(a).

102.     Through the acts and omissions described throughout this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisee regarding the operations of its respective hotel properties even though Franchisor Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

103.     Violations of 18 U.S.C §1595(a) by Franchisor Defendants and Franchisee Defendant as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (O.B.J.) to suffer substantial physical and psychological injuries

and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

## II.    Count II: Vicarious Liability for TVPRA Violations (Franchisor Defendants only).

104.    Franchisee Defendant acted as the actual agent of its respective Franchisor Defendants when operating its respective hotel property.

105.    Through the acts and omissions described throughout this Original Complaint, Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

106.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

107.    Franchisor Defendants are vicariously liable for the TVPRA violations of its franchisees and the subagents of that franchisee.

108.    As alleged above, Franchisor Defendants are directly liable to Jane Doe (O.B.J.) for violations of the TVPRA, as a beneficiaries under 18 U.S.C §1595(a). Franchisee Defendant is also directly liable to Jane Doe (O.B.J.) under § 2255.  Franchisor Defendants are vicariously liable to Jane Doe (O.B.J.) for those same violation.

## TOLLING OF LIMITATIONS

109.    To the extent any Defendant asserts an affirmative defense based on a statute of limiations, Jane Doe (O.B.J.) alleges that her claims under 18 U.S.C. § 1595 are timely because this action was commenced within ten years of the date on which her cause of action arose. Jane Doe (O.B.J.) was continuously trafficked at both the Holiday Inn and Holiday Inn Express named herein through at least the end of January 2016.

110.    To the extent any Defendant contends that Jane Doe (O.B.J.)'s claims accrued earlier or are otherwise time-barred, Jane Doe (O.B.J.) invokes the discovery rule. During her trafficking and for years afterward, she did not understand that she was a victim of "human trafficking" as that term is defined by law, or that her injuries arose, in part, from being trafficked at Defendants' hotels. While she knew she was being compelled to engage in commercial sex for her traffickers' financial benefit, she internalized her exploitation as a toxic relationship and personal failure – not as a legally cognizable injury or as the product of force, fraud, or coercion in which hotels and a franchisor could be civilly liable. She did not recognize the legal nature of her injuries or the role of those who enabled and profited from her trafficking until well within ten years of filing this lawsuit. Accordingly, any applicable limitations period did not begin to run until she discovered, or in the exercise of reasonable diligence could have discovered, the legal cause of her injury.

111.    In the alternative, and to the extent any Defendant contends that any of Jane Doe (O.B.J.)'s claims accrued earlier or are otherwise time-barred, Jane Doe (O.B.J.) invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants at the both the Holiday Inn and Holiday Inn Express, including a sustained course of beneficiary participation in a sex-trafficking venture over multiple years rather than a single, isolated event.

112.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (O.B.J.) also invokes the doctrine of equitable tolling. As a result of being a victim of sex trafficking, she faced extraordinary and ongoing circumstances – arising through no fault of her own – that prevented her from timely investigating her claims, identifying the responsible entities, and retaining counsel, and those circumstances did not end more than ten years before she filed this lawsuit.

113.    The combination of pervasive emotional manipulation, repeated acts of physical abuse, and continuing fear for her own safety and that of her family had severe and lasting effects on her mental health, judgment, memory, and capacity to act in her own interests, which persisted well beyond the period of active trafficking. Plaintiff's psychological and emotional responses were typical of individuals subjected to chronic exploitation: she experienced trauma bonding, confusion, dependence, and shame. These trauma responses impaired her ability to understand that she was being trafficked and to identify the causal relationship between the trafficker's conduct and her resulting injuries.

114.    As a result of these effects, Jane Doe (O.B.J.) was unable, despite reasonable diligence, to recognize, discover, and meaningfully pursue her legal claims against Defendants until within the ten-year period preceding the filing of this lawsuit. She did not understand, and could not reasonably have been expected to understand, the extent of Defendants' roles in facilitating her trafficking or that they could be sued for their conduct until after she had gained sufficient distance from her traffickers, begun to process her trauma, achieved some stability in her recovery, and obtained legal counsel.

115.    Expert testimony, law-enforcement observations, and the experiences of trafficking survivors demonstrate that victims frequently do not understand or acknowledge their victimization until long after the trafficking ends, often only with therapeutic intervention. Plaintiff's trajectory is consistent with this recognized pattern: the effects of coercion and trauma prevented her from realizing that she had been trafficked or connecting her injuries to the trafficker's conduct during the trafficking periodtraffickers.

## DAMAGES

116.    Franchisor Defendants' and Franchisee Defendants' acts and omissions, individually and collectively, caused Jane Doe (O.B.J.) to sustain legal damages.

117. Franchisor Defendants and Franchisee Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (O.B.J.).

118. Jane Doe (O.B.J.) is entitled to be compensated for personal injuries and economic damages, including:

   a. Actual damages (until trial and in the future);

   b. Incidental and consequential damages (until trial and in the future);

   c. Mental anguish and emotional distress damages (until trial and in the future);

   d. Lost earnings and lost earning capacity (until trial and in the future);

   e. Necessary medical expenses (until trial and in the future);

   f. Life care expenses (until trial and in the future);

   g. Physical pain and suffering (until trial and in the future);

   h. Physical impairment (until trial and in the future);

   i. Exemplary/Punitive damages;

   j. Attorneys' fees;

   k. Costs of this action; and

   l. Pre-judgment and all other interest recoverable.

## JURY TRIAL

119. Jane Doe (O.B.J.) demands a jury trial on all issues.

## RELIEF SOUGHT

120. WHEREFORE, Jane Doe (O.B.J.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (O.B.J.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe

(O.B.J.) may, in law or in equity, show herself to be justly entitled.

Respectfully Submitted,

**LOCKS LAW FIRM**

By:  */s/Anthony P. Mastroianni*
Anthony P. Mastroianni
675 Third Avenue, 8th Floor
New York, New York 10017
Tel: (212) 838-3333
Fax: (212) 838-3735
Email: amastroianni@lockslaw.com

**David E. Harris**
*(pro hac vice forthcoming)*
**Meagan E. Hassan**
*(pro hac vice forthcoming)*
**SICO HOELSCHER HARRIS, LLP**
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
dharris@shhlaw.com
mhassan@shhlaw.com

**Annie McAdams**
*(pro hac vice forthcoming)*
**ANNIE MCADAMS PC**
2900 North Loop West
Suite 1130
Houston Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
annie@mcadamspc.com

**ATTORNEYS FOR PLAINTIFF JANE DOE (O.B.J.)**

.

37