USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 10/02/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JANE DOE (O.B.J.),

Plaintiff,

-against-

25-cv-10815 (LAK)

INTER-CONTINENTAL HOTELS GROUP, INC., *et al.*,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION GRANTING MOTIONS TO DISMISS**

Appearances:

Meagan Hassan
SICO, HOELSCHER, HARRIS LLP

Anthony P. Mastroianni
LOCKS LAW FIRM PLLC

*Attorneys for Plaintiff*

Robert S. Bernstein
Cynthia G. Burnside
John M. Hamrick
Talis Trevino
HOLLAND & KNIGHT LLP

*Attorneys for Defendants Six Continents Hotels, Inc. and Holiday Hospitality Franchising, LLC*

Danielle A. Pascale
TYSON & MENDES

*Attorney for Defendant CWI Chelsea Hotel, LLC*

Michael D. Kabat
Celeste Creswell Huskison
KABAT, CHAPMAN & OZMER LLP

*Attorneys for Defendant Brisam Management (DE) LLC*

LEWIS A. KAPLAN, *District Judge.*

Plaintiff O.B.J. allegedly was sex trafficked at two Manhattan hotels on numerous occasions between 2015 and 2016. She has sued the operators of those hotels and their franchisors, alleging that those defendants are liable to her for continuing to rent rooms to her trafficker despite knowing or unreasonably failing to realize that she was being trafficked. Some of the defendants have moved to dismiss for failure to state a claim.

The motions will be granted. The complaint alleges that the hotels provided plaintiff's alleged trafficker with the same hotel services that they would provide to any paying customer. Under the provision of the Trafficking Victims Protection Reauthorization Act that plaintiff invokes, that conduct, without more, does not give rise to civil liability.

## *Facts*

In or around July 2015, Plaintiff O.B.J. traveled to New York with a friend under the pretense of meeting the friend's boyfriend.[1] On that trip, plaintiff was accused of stealing and thereafter was sexually trafficked for months by an unnamed trafficker.[2] Between July 2015 and January 2016, the trafficker forced plaintiff to engage in commercial sex acts numerous times a day through physical and mental abuse, including threats to her life and the lives of her family members.[3] This trafficking allegedly took place, at least in part, at hotels in Manhattan – a Holiday

---

1. Compl. (Dkt 1) ¶ 28.

2. *Id.*

3. *Id.* ¶¶ 28-29.

Inn on West 26th Street and a Holiday Inn Express on West 29th Street.[4] Plaintiff allegedly was trafficked at each of those locations "numerous times."[5]

*The TVPRA*

The Trafficking Victims Protection Reauthorization Act ("TVPRA") generally makes it a crime to force a person to engage in commercial sex acts through force, threats of force, fraud, or coercion.[6] That conduct is what this opinion means when it says "trafficking" or "sex trafficking." As relevant here, the statute provides a cause of action against certain beneficiaries of trafficking, specifically, anyone who "knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."[7]

*The Parties*

Plaintiff has sued the alleged operators and franchisors of the hotels at which she allegedly was trafficked. The complaint contends that the defendants knew or should have known that she was being trafficked at these hotels but nevertheless allowed such trafficking to continue

4 *Id.* ¶¶ 31-32.

5 *Id.* ¶¶ 31-32.

6 18 U.S.C. § 1591(a).

7 *Id.* § 1595(a).

and financially benefitted by renting rooms to her trafficker, making the defendants liable under the TVPRA as beneficiaries of her trafficking.

Defendant CWI Chelsea Hotel, LLC ("CWI") allegedly owned and operated the Holiday Inn, and Defendant Brisam Management (DE) LLC ("Brisam," and collectively with CWI, "Franchisees") allegedly owned and operated the Holiday Inn Express.[8] The remaining defendants are four entities alleged to form part of the IHG hotel group that licensed the Holiday Inn and Holiday Inn Express brands to the Franchisees: Inter-Continental Hotels Group, Inc., Intercontinental Hotels Group (U.S.A.) Franchising, Inc., Six Continents Hotels, Inc., and Holiday Hospitality Franchising, LLC (collectively, "Franchisors").[9]

*Defendants' Alleged Knowledge of Plaintiff's Trafficking*

Plaintiff alleges that the defendants knew or should have known about her trafficking because "there were obvious signs that her trafficker was engaged in sex trafficking," including that the hotel rooms in which plaintiff was trafficked frequently were paid for with cash or prepaid cards with no ID being required at check-in; plaintiff would be dressed in provocative clothing and accompanied by her trafficker at check in but would not speak or make eye contact with hotel staff; other women were trafficked at the same hotel at the same time; plaintiff and her trafficker would stay for multiple days but would use a "Do Not Disturb" door hanger to keep out the housekeepers; plaintiff or her trafficker often would ask for remarkable numbers of towels; the trafficker would

---

8. Compl. ¶¶ 18-19.

9. *Id.* ¶ 16.

linger near the room or in the hotel lobby when plaintiff was "with a john"; management and/or staff at both hotels would solicit services from plaintiff and other trafficking victims; and five to ten men per day would enter and leave plaintiff's room at unusual times and stay for only brief periods.[10] Plaintiff alleges that the Franchisors knew or should have known about the trafficking because of their policy or protocol requiring the reporting of suspected criminal activity, including sex trafficking.[11]

The complaint further alleges that defendants knew or should have known about "the widely known and pervasive relationship between sex trafficking and the hotel industry" and about sex trafficking at Holiday Inn and Holiday Inn Express hotels generally.[12] The complaint alleges, too, that defendants had actual or constructive knowledge of sex trafficking at the specific hotels at issue because of online reviews, although no such reviews are quoted or cited.[13]

*Defendants' Alleged Facilitation of Plaintiff's Sex Trafficking*

Plaintiff alleges that despite having actual or constructive knowledge of plaintiff's trafficking, the Franchisees benefitted from "continued association with her traffickers by providing

---

[10] *Id.* ¶ 65.

[11] *Id.* ¶ 69.

[12] *Id.* ¶¶ 35-56.

[13] *Id.* ¶¶ 57-64.

them a venue in the form of hotel rooms and related services."[14] The Franchisees allegedly further facilitated plaintiff's trafficking by (1) "allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking"; (2) having "inadequate and inadequately enforced sex trafficking notice and training for hotel staff"; (3) "choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures"; and (4) "implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff."[15]

Plaintiff alleges that the Franchisors maintained sufficient control over the Franchisees to correct essentially all of the above failures yet failed to do so.[16] They allegedly adopted inadequate policies for training and disciplining employees regarding sex trafficking issues and declined to take obvious and apparent steps to stop the Franchisees from facilitating sex trafficking.[17] In addition, the complaint alleges that the Franchisors allowed traffickers to reserve rooms using cash and provided traffickers with access to internet services that facilitated trafficking,

---

14 *Id.* ¶¶ 73, 77.

15 *Id.* ¶¶ 74, 78.

16 *Id.* ¶¶ 79-80.

17 *Id.* ¶ 83.

although there is no allegation that the hotels did not provide those same benefits to all customers.[18] According to the complaint, the Franchisors "attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal."[19]

*Motions to Dismiss*

The Franchisees and two of the Franchisors – Six Continents Hotels, Inc., and Holiday Hospitality Franchising, LLC – have moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[20] The two other Franchisors – Inter-Continental Hotels Group, Inc. and Intercontinental Hotels Group (U.S.A.) Franchising, Inc. – have not appeared.

## ***Discussion***

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."[21] "[A]ccepting the allegations in the complaint as true and

---

18 *Id.* ¶ 83(i), (j).

19 *Id.* ¶ 83(f).

20 Dkts 52, 57, 60.

21 *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

drawing all reasonable inferences in favor of the plaintiff,"[22] a court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[23] This plausibility standard "is not akin to a 'probability requirement,'" but it requires "more than a sheer possibility that a defendant has acted unlawfully."[24]

The complaint asserts a single claim of beneficiary liability under the TVPRA against all defendants.[25] For the reasons that follow, plaintiff's complaint fails plausibly to allege that any defendant "participat[ed] in a venture" involving sex trafficking – and therefore fails to state a claim.

*Legal Background*

As noted above, the TVPRA in certain circumstances imposes civil liability on those that financially benefit from sex trafficking. This cause of action runs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from *participation in a venture* which that person knew or should have known has engaged in an act in violation of this chapter."[26]

---

22 *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022).

23 *Iqbal*, 556 U.S. at 678.

24 *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

25 Plaintiff alleges an additional count of "Vicarious Liability" against the Franchisors, seeking to hold those defendants accountable for the actions of the Franchisees . Compl. ¶¶ 104-08. The complaint states no valid claim against the Franchisees, so this vicarious liability count fails as well.

26 18 U.S.C. § 1595(a) (emphasis added).

To state a claim for beneficiary liability under the TVPRA, a plaintiff plausibly must allege that (1) "he is the victim of an underlying violation of the statute"; (2) "the defendant *participated in the venture* that carried out the violation and caused the victim's injury"; (3) "the defendant knew or should have known that the venture had engaged in an act that violated the statute"; and (4) "the defendant knowingly benefitted from, attempted to benefit from, or conspired to benefit *from its participation in the venture* financially or by receiving anything of value."[27]

For purposes of the forthcoming analysis, the Court assumes without deciding that plaintiff plausibly has alleged that she was the victim of sex trafficking in violation of 18 U.S.C. § 1591(a), that the defendants knowingly benefitted financially from their relationship with plaintiff's trafficker, and that the defendants knew or should have known that plaintiff's trafficker was engaging in acts in violation of Section 1591(a). On these assumptions, the only remaining question would be whether plaintiff plausibly has alleged any defendant's "participation in a venture" with her trafficker.[28]

The phrase "participation in a venture" "require[s] a showing that the defendant took part in an enterprise or undertaking that involved elements of risk, potential gain, or both."[29] Thus, in order to state a legally sufficient claim, a plaintiff must allege facts that, if true, plausibly showed

---

27 *Mueller v. Deutsche Bank Aktiengesellschaft*, 185 F.4th 307, 312 (2d Cir. 2026) (emphases added).

28 Regarding plaintiff's allegation that the Franchisors may be held liable under Section 1595(a) for participating in a venture with the Franchisees, see *infra* note 49.

29 *Mueller*, 185 F.4th at 313.

or implied that a defendant and her trafficker in some sense engaged in a "shared enterprise" or a "common undertaking."[30] The factors relevant to that inquiry include

> "whether the defendant owned an interest in the venture; whether the defendant acted with the purpose or desire to promote the venture's success; whether the defendant and the venture otherwise acted with a common purpose; whether the defendant maintained a continuous relationship with the venture; whether the defendant exercised control over the venture's operations; and whether the defendant's association with the venture went beyond a mere arm's-length transaction."[31]

In *Mueller v. Deutsche Bank Aktiengesellschaft*, the plaintiffs – the estates of individuals allegedly enslaved and murdered by the Islamic State of Iraq and Syria ("ISIS") – alleged that Deutsche Bank had helped ISIS raise funds to support terrorist attacks and trafficking crimes in two ways.

First, it allegedly facilitated tax-fraud schemes against European governments spearheaded by two operatives of al-Qaeda, an alleged affiliate of ISIS.[32] In furtherance of those schemes, the bank allegedly provided the bank accounts through which the proceeds of the scheme flowed, enabled execution of the trades that formed the basis for the fraud, prepared certain documentation, gave the trades a veneer of professionalism and legitimacy, allowed the proceeds to be converted to U.S. dollars, and helped the al-Qaeda fundraisers transfer the funds to accounts controlled by or affiliated with al-Qaeda.[33] The bank allegedly "charged fees above normal rates"

---

30 *Id.* at 314 (first quoting *Doe I v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024); and then quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726-27 (11th Cir. 2021)).

31 *Id.*

32 *Id.* at 310-11.

33 *Id.*

for these services given the "high-risk and suspicious nature of the individuals and entities involved."[34]

Second, the bank allegedly entered into "corespondent-banking" relationships with ISIS-controlled banks in Iraq that allowed those banks to convert Iraqi dinar into U.S. dollars.[35] Deutsche Bank allegedly processed thousands of transactions worth billions of dollars for the ISIS-controlled banks.[36] Without the access to the international and U.S. financial systems that these transactions provided, ISIS would have struggled to "pay external parties for weapons, goods[,] and services."[37]

As to the tax-fraud scheme, the Second Circuit held that the complaint's allegations "establish[ed] little more than an arm's-length business relationship between a bank and its customers, as well as the routine provision of ordinary, nondifferentiated financial services."[38] There was no indication, the court explained, "that Deutsche Bank acquired a financial interest in the schemes, that Deutsche Bank exercised operational control over the schemes, that Deutsche Bank provided specialized services to individuals involved in the schemes, or that Deutsche Bank and the fraudsters acted with a common purpose."[39]

---

34 *Id.* at 311 (quoting the complaint).

35 *Id.*

36 *Id.* at 312.

37 *Id.* at 311 (quoting the complaint).

38 *Id.* at 314.

39 *Id.*

The complaint's allegations concerning the ISIS-controlled banks fared "no better" because "[n]othing" about the services the bank provided "indicate[ed] a common scheme."[40] Deutsche Bank "possessed no interest in the ISIS-controlled banks beyond its general interest in earning fees by offering correspondent-banking services, did not exercise control over their operations, did not provide specialized services, and did not share a common business purpose with them."[41] Instead, the bank "merely provided routine financial services for the purpose of furthering *its* business," thus serving as "a passive service provider, not a co-venturer."[42]

The Second Circuit further explained that, even if ISIS's fundraising activities could not have succeeded without the banks's services, the bank did not "t[ake] part in the group's fundraising ventures any more than a utility company takes part in its customers' businesses by satisfying their essential demand for electricity."[43] The bank's "interest was limited to collecting fees for providing the same kinds of financial services that it would to any other customer."[44] That the bank charged risk-adjusted fees did not "indicate a purpose on its part to promote its customers' businesses or represent an interest therein."[45] Nor did the fact that the bank may have knowingly exposed itself to legal risks through its dealings with individuals and institutions associated with

---

40 *Id.*

41 *Id.*

42 *Id.*

43 *Id.* at 315.

44 *Id.*

45 *Id.*

ISIS show "that Deutsche Bank was seeking to promote the venture as opposed to merely enriching itself."[46] Congress knows how to impose liability for merely providing "material support" to an organization, but chose not to do so in Section 1595(a) of the TVPRA.[47] Participation in a venture "therefore requires more than providing financial services at arm's length."[48] Accordingly, the Circuit held that plaintiffs failed to state a claim because they did not plausibly alleged that the bank had participated in a venture with ISIS or its fundraisers.

*Analysis*

Here, plaintiff has failed plausibly to allege that the defendants participated in a venture with her trafficker.[49] Her theory is that the hotels knew or should have known that she was being trafficked yet continued to rent hotel rooms to her trafficker and otherwise failed to implement policies to prevent sex trafficking from taking place at their properties. These allegations, however,

---

46 *Id.*

47 *Id.* (citing 18 U.S.C. § 2339B(a)(1)).

48 *Id.* at 314.

49 In addition to arguing that defendants engaged in "a venture with sex traffickers," *e.g.* Compl. ¶ 91, plaintiff argues that the Franchisors engaged in "a commercial venture with Franchisee Defendant[s]," *id.* ¶¶ 86, 92. But under Section 1595(a), the "venture" must have "engaged in an act in violation of this chapter" – that is, as relevant here, an act in violation of 18 U.S.C. § 1591(a), which makes it a crime to engage in sex trafficking or to financially benefit from "knowingly assisting, supporting, or facilitating" sex trafficking. The only allegation that specifically addresses the Franchisees' alleged violation of Section 1591(a) is the conclusory assertion that "[t]his venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendant[s] and the widespread sex trafficking at the Subject [hotels] named herein." Compl. ¶¶ 86(d), 92(d). Plaintiff's opposition papers likewise fail adequately to develop an argument that the Franchisees engaged in criminal conduct through their operation of the hotels.

"establish little more than an arm's-length business relationship between" a hotel and its patrons and thus fail to state a claim for beneficiary liability.[50]

Like the bank in *Mueller*, the hotels here possessed no interest in the trafficking venture "beyond its general interest in earning fees by offering [hotel] services."[51] A hotel's mere renting of a room to a customer "does not indicate a purpose on [the hotel's] part to promote its customers' businesses or represent an interest therein,"[52] and nothing else in the complaint plausibly suggests that any defendant acted with a purpose other than "the purpose of furthering *its* business."[53] The hotels likewise are not alleged to have exercised control over the trafficking operation aside from the mere fact that the hotels satisfied the operation's "essential demand for" hotel rooms and provided the trafficker with the same privileges and services as any other customer.[54] There is no indication that the hotels had any interaction with her trafficker whatsoever beyond "the routine provision of ordinary, nondifferentiated" hotel services.[55]

Plaintiff conclusorily asserts throughout the complaint that defendants "actively facilitated" and "implicitly encourag[ed]" her trafficking by "affirmatively creating a favorable

---

50 *Mueller*, 185 F.4th at 314.

51 *Id.* at 314.

52 *Id.* at 315.

53 *Id.* at 314.

54 *Id.* at 315.

55 *Id.* at 314.

venue where access was easy, risks of interference were low, and traceability was minimal."[56] The allegations underlying these assertions, however, describe only inaction rather than any genuinely affirmative conduct. Defendants allegedly failed adequately to train and supervise employees regarding sex trafficking, failed to adopt or more stringently enforce anti-trafficking policies, failed to intervene to stop plaintiff's trafficking, and failed otherwise to alter its general way of doing business to make it more difficult for sex trafficking to occur. Plaintiff does not identify a single policy that defendants *adopted* with the intent of furthering sex trafficking, nor does she allege that the defendants provided services or benefits to her trafficker that they did not provide to all customers. These allegations do not plausibly give rise to the inference that the defendants were "seeking to promote the [sex-trafficking] venture as opposed to merely enriching [themselves]."[57]

Plaintiff argues that this case is more like *Riccho v. McLean*[58] than *Mueller*. There, the plaintiff allegedly was held against her will and physically and sexually abused at a motel operated by a husband and wife, the Patels, who lived on the property and witnessed obvious signs of plaintiff's mistreatment and captivity.[59] Plaintiff's alleged captor, Clark McLean, "had prior commercial dealings with the Patels," and McLean and Mr. Patel "enthusiastically expressed the[ir] intent" to "reinstate" those commercial dealings for profit "by exchanging high-fives in the motel's

---

56 Compl. ¶¶ 78(d), 83(f).

57 *Mueller*, 185 F.4th at 315.

58 853 F.3d 553 (1st Cir. 2017) (Souter, J.).

59 *Id.* at 555.

parking lot while speaking about 'getting this thing going again.'"[60] That exchange took place "in circumstances in which McLean's coercive and abusive treatment of [plaintiff] as a sex slave had become apparent to the Patels" – for example, Ms. Patel had "nonchalantly ignored [plaintiff's] pleas for help in escaping from McLean's custody" and "show[ed] indifference to [plaintiff's] obvious physical deterioration" when "visiting the rented quarters to demand further payment."[61] The First Circuit held that it was plausibly inferable "that the gainful business that Mr. Patel and McLean spoke of had been and would be in supplying sexual gratification," and that "the Patels understood that in receiving money as rent for the quarters where McLean was mistreating [plaintiff], they were associating with him in an effort to force [plaintiff] to serve their business objective."[62]

*Ricchio* was one of four out-of-circuit cases from which *Mueller* gleaned the factors relevant to determining participation in a venture.[63] And it easy to see why *Ricchio* is consistent with the outcome in *Mueller* and thus distinguishable here. The complaint in *Ricchio* included allegations that the motel operators and plaintiff's trafficker had reached an express agreement jointly to engage in the business of "supplying sexual gratification" and "to force [plaintiff] to serve

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Mueller*, 185 F.4th at 314.

their business objective."[64] Those allegations "were far stronger than just an operator renting rooms to a trafficker."[65]

The district court cases on which plaintiff relies either conflict with *Mueller* or are distinguishable and unpersuasive. In *M.A. v. Wyndham Hotels & Resorts, Inc.*,[66] and *A.B. v. Marriott International, Inc.*,[67] for example, the courts asked whether the plaintiff had alleged merely "a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement."[68]

To the extent that the cases upon which plaintiff relies hold that a plaintiff may plausibly allege a hotel operator's "tacit agreement" to participate in a sex trafficking venture merely by alleging a "continuous business relationship" involving the provision of ordinary, nondifferentiated hotel services to that venture, those cases conflict with *Mueller*. The bank in *Mueller* likewise had a continuous business relationship with a terrorist venture, processing "thousands of transactions" "worth billions of dollars" for ISIS.[69] Yet allegations that the bank had "provid[ed] the same kinds of financial services that it would to any other customer" was

64 *Ricchio*, 853 F.3d at 555.

65 *K.H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063, at *3 (11th Cir. Feb. 9, 2024).

66 425 F. Supp. 3d 959 (S.D. Ohio 2019).

67 455 F. Supp. 3d 171 (E.D. Pa. 2020).

68 *Id.* at 186 (quoting *M.A.*, 425 F. Supp. 3d at 970).

69 *Mueller*, 185 F.4th at 311.

insufficient to state a claim.[70] And even if a trafficking operation "could not have succeeded . . . without access" to hotel rooms, a hotel operator does not take part in a trafficking venture by supplying those rooms "any more than a utility company takes part in its customers' businesses by satisfying their essential demand for electricity."[71]

Plaintiff argues that *Mueller* is distinguishable because the bank there was "several steps removed" from ISIS's trafficking whereas the hotels here provided the very rooms in which she was trafficked.[72] On plaintiff's theory, apparently, a defendant that continuously provides nondifferentiated services with a sufficiently close nexus to trafficking (e.g., hotel rooms), without more, participates in a venture with the trafficker, but a defendant that continuously provides nondifferentiated services that are sufficiently remote from trafficking (e.g., banking services), without more, does not participate in a venture with the trafficker. That distinction is not tenable under the reasoning of *Mueller*. As *Mueller* made clear, where a defendant provides " the same kinds of . . . services that it would to any other customer," it does not matter how "essential" the services are to a violation of the TVPRA.[73] Instead a plaintiff must plead facts – beyond the existence of a series of ordinary, non-customized transactions by an otherwise legitimate business – that suggest the defendant "took part in an enterprise or undertaking" with a trafficker.[74] The

---

70 *Id.* at 315.

71 *Id.*

72 Dkt 83 at 2.

73 *Mueller*, 185 F.4th at 315.

74 *Id.* at 313.

complaint's allegations here fall short in that regard for the reasons already stated. Other courts have reached the same conclusion on similar facts.[75]

In sum, alleging that a hotel knew or should have known that trafficking was taking place on its property is necessary, but not sufficient, to establish beneficiary liability under the TVPRA. A plaintiff must do more to distinguish participating in a venture from providing material support to a venture.[76] Allegations, for example, that agents of the hotel worked directly with traffickers by serving as lookouts for the police,[77] otherwise maintained personal relationships with a trafficker,[78] designated a certain area of the hotel for a trafficker to use,[79] expressly formed a partnership with a trafficker,[80] or provided tailored services or special benefits to a trafficker[81] are the types of allegations that could show or at least plausibly suggest that a hotel and a trafficker

75 *See, e.g.*, *Doe (S.B.C.) v. Six Continents Hotels, Inc.*, 800 F. Supp. 3d 1139, 1146 (W.D. Wash. 2025); *B.J. v. G6 Hospitality, LLC*, No. 22-cv-3765, 2023 WL 3569979, at * (N.D. Cal. May 19, 2023).

76 *See Mueller*, 185 F.4th at 315..

77 *K.H.*, 2024 WL 505063, at *4 n.6.

78 *Doe (S.A.S.) v. ESA P Portfolio LLC*, No. 23-cv-6038, 2024 WL 3276417, at *2 (W.D. Wash. July 2, 2024).

79 *Doe v. Hyatt Corp.*, No. 24-cv-1229, 2025 WL 1953857, at *4 (N.D. Tex. July 15, 2025).

80 *Ricchio*, 853 F.3d at 555.

81 *See Mueller*, 185 F.4th at 315 (distinguishing *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023)).

engaged in a shared enterprise or common undertaking. Facts of that nature are not alleged in this complaint.[82]

## *Conclusion*

For the foregoing reasons, the motions to dismiss (Dkts 52, 57, 60) are **GRANTED**. All claims against defendants CWI Chelsea Hotel, LLC, Brisam Management (DE) LLC, Six Continents Hotels, Inc., and Holiday Hospitality Franchising, LLC, are dismissed with prejudice.

SO ORDERED.

Dated: October 2, 2026

Lewis A. Kaplan
United States District Judge

---

82 To prove that defendants knew or should have known plaintiff was being trafficked, the complaint alleges that "[m]anagement and/or staff at both [hotels] would solicit services from Jane Doe (O.B.J.) and other girls being trafficked." Compl. ¶ 65(h). Plaintiff now argues that this allegation helps to show participation in a venture, too. Dkt 83 at 2. In *Mueller*, plaintiffs similarly alleged that "some of [Deutche Bank's] employees participated in the . . . fraud scheme" orchestrated by the al-Qaeda operatives. 185 F.4th at 315 (quoting the complaint). But the court held that allegation was too cursory to be taken at face value. *Id.* at 315-16. Likewise here. The complaint provides no details about the circumstances under which this alleged solicitation took place. That is a problem for multiple reasons, including because that the Court is unable plausibly to infer that the employees were acting within the scope of their employment when they allegedly engaged in such conduct. *See, e.g.*, *I.R. v. I Shri Khodiyar, LLC*, 723 F. Supp. 3d 1327, 1343 n.15 (N.D. Ga. 2024).